IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN SECTION OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| ADRIAN DESHUN DELK, | ) | |
| | ) | **Case No.  16-1275-JDB-cgc** |
| PLAINTIFF, | ) | |
| | ) | |
| | ) | |
| | ) | **COMPLAINT FOR VIOLATIONS OF** |
| | ) | **THE CIVIL RIGHTS ACT OF 1871, 42** |
| v. | ) | **U.S.C. § 1983, AND TENNESSEE** |
| | ) | **COMMON LAW** |
| | ) | |
| | ) | |
| CORECIVIC d/b/a "HARDEMAN | ) | |
| COUNTY CORRECTIONAL FACILITY," | ) | **JURY TRIAL DEMANDED** |
| WARDEN GRADY PERRY, DANITA | ) | **PURSUANT TO FED. R.  CIV. PRO. 38(a)** |
| WOODS, TOMICKA MCKINNIE, | ) | **& (b)** |
| COLUMBUS MOLONE, and LATOYA | | |
| LOUDON | | |
| | | |
| DEFENDANTS. | | |

---

## SECOND AMENDED COMPLAINT

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Adrian Deshun Delk (hereinafter "Plaintiff"), by and through his designated attorneys, for his Complaint alleges as follows:

### I.

### <u>NATURE OF THE ACTION</u>

1.    This suit is brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 ("Section 1983") and 1988 and Tennessee statutory and common law in order to remedy Defendants actions in causing Plaintiff to be deprived of his constitutional rights under color of law which were secured by the Eighth and Fourteenth Amendments of the United States

Constitution and narrowly tailored to address the issues of deliberate indifference to threats of harm, deliberate indifference to harm to Plaintiff, and deliberate indifference to Plaintiff's right to necessary medical care for severe medical conditions resulting from the multiple assaults which occurred due to Defendants' deliberate indifference which was so severe as to shock the conscience of the Court. These attacks and the resultant permanent medical conditions, exacerbated by wont of treatment, were the result of institutional failures endemic to CoreCivic facilities in general and HCCF in particular. Plaintiff's own case demonstrates a pattern of deliberate indifference resultant from intentional understaffing and refusal of medical treatment in an effort to profit from their taxpayer -funded contracts with Tennessee without providing those constitutionally-mandated services for which Tennessee has paid them.

2.     In 2016, CoreCivic, Inc. was sued by its own shareholders because, among other things, the company misrepresented its pattern of understaffing and poor medical care, which led the Federal Bureau of Investigation (hereinafter "FBI") to investigate, and ultimately, the Federal Bureau of Prisons to cancel its business relationship with CoreCivic.  CoreCivic and its corporate leaders have bolstered the company's profits by reducing staff levels and cutting medical care, despite being contractually obligated to provide minimum staff levels and adequate medical care to all prisoners.  CoreCivic, and its leaders, knowingly and intentionally tolerate assault and mayhem for the sake of higher profits.  They have concluded that it is more profitable to pay an occasional fine or settlement than to prevent assaults and grievous injuries. Furthermore, the company has repeatedly engaged in fraud and evidence tampering in order to conceal its systemic understaffing, contract violations, and employee misconduct. Notwithstanding these and numerous warnings, CoreCivic deliberately continued to provide inadequate staffing, training, supervision, and medical care at Hardeman County Correctional Facility, resulting in

multiple assaults and grievous injuries sustained by Plaintiff Delk. CoreCivic is liable to Plaintiff Delk under 42 U.S.C. §§ 1983 and 1988 as well as state law theories of negligence and gross negligence.

## II.

## SUBJECT MATTER JURISDICTION AND VENUE

3.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under Section 1983 and Section 1988. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) in that the federal claims substantially predominate over state law claims and the claims are so related that they form part of the same case or controversy.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## III.

## THE PARTIES AND PERSONAL JURISDICTION

5.      Plaintiff Adrian Deshun Delk is a resident of Shelby County, Tennessee.  At all times material to this cause, Plaintiff was incarcerated at the Hardeman County Correctional Facility, located in Hardeman County, Tennessee.  HCCF is owned and operated by Core Civic.

6.      Defendant CoreCivic, previously doing business as Corrections Corporation of America, (hereinafter "CC," "CoreCivic" or "CCA"), is a private Real Estate Investment Trust which owns and operates the Hardeman County Correctional Facility (hereinafter "HCCF")[1], housing prisoners sentenced to confinement in the Department of Corrections.  As such,

---

[1] As used throughout this Amended Complaint, HCCF refers to the facility and its operator, CoreCivic, and allegations made against HCCF should be construed as allegations against CoreCivic.

CoreCivic performs a public function traditionally reserved to the state and is therefore subject to suit under 42 U.S.C. § 1983.  CoreCivic is a corporation incorporated in the state of Delaware. Its principal office's location in the state of Tennessee is 10 Burton Hills Boulevard, Nashville, Tennessee 37215.  It can receive service of process through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919. CoreCivic owed a duty to Plaintiff and breached that duty and is subject to liability in this case. At all times relevant to this Complaint, CoreCivic acted under color of law, performed government functions, was entwined in a symbiotic relationship with the Tennessee Department of Corrections, and was otherwise engaged in state action consistent with the Supreme Court's analysis in <u>Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,</u> 531 U.S. 288 (2000). is a "person" within the meaning of 42 U.S.C. § 1983.

7.     Defendant Grady Perry (hereinafter "Defendant Perry" or "Perry"), Warden of the Facility, upon information and belief, is a citizen and resident of Hardeman County, Tennessee. At all times material to this cause, Defendant Perry was employed by CoreCivic and acted pursuant to the rules and regulations of the Tennessee Department of Corrections and policies of CoreCivic. Defendant Perry is an employee and agent of CoreCivic with policymaking authority and is ultimately responsible for the oversight and implementation of all policies at HCCF. At all times material to this cause, Defendant Perry was acting under color of law.  Defendant Perry is being sued in his individual capacity.[2]

8.     Defendant Correctional Officer (hereinafter "C.O.") Columbus Molone (hereinafter "Defendant Molone," "Case Worker Molone," or "Molone") upon information and

---

[2] This Court dismissed Plaintiff's claims against Defendants CoreCivic and Perry on October 11, 2019 without prejudice. Plaintiff now asserts additional claims against CoreCivic and Perry arising under the same transaction or occurrence and relating back to the original complaint and within the one-year savings statute.

belief, is a citizen of Tennessee and at all times material to this cause, Defendant Molone was employed by Defendant HCCF performing his duties as a C.O. or case manager, and was acting under color of state law.  He is being sued in his individual capacity.

9.     Defendant C.O. Danita Woods (hereinafter "Defendant Woods" or "Woods) upon information and belief, is a citizen of Tennessee and at all times material to this cause, C.O. Woods was employed by Defendant CoreCivic as a correctional officer at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF.  She is being sued in her individual capacity.

10.     Defendant C.O. Latoya Louden (hereinafter "Defendant Louden" or "Louden") upon information and belief, is a citizen of Tennessee and at all times material to this cause, C.O. Louden was employed by Defendant CoreCivic as a correctional officer at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF.  She is being sued in her individual capacity.

11.     Defendant C.O. Tomicka McKinnie (hereinafter "Defendant McKinnie" or "McKinnie") upon information and belief, is a citizen of Tennessee and at all times material to this cause, C.O. McKinnie was employed by Defendant CoreCivic as a correctional officer at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF.  She is being sued in his individual capacity.

12.     Defendant C.O. Inell Allen (hereinafter "Defendant Allen" or "Allen") upon information and belief, is a citizen of Tennessee and at all times material to this cause, C.O. Allen was employed by Defendant CoreCivic s a correctional officer at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a

correctional officer at HCCF.  She is being sued in her individual capacity.[3]

13.      Defendant C.O. Kelsey Gates (hereinafter "Defendant Gates" or "Gates") upon information and belief, is a citizen of Tennessee and at all times material to this cause, C.O. Gates was employed by Defendant CoreCivic as a correctional officer at HCCF, with the specific job as an internal affairs officer, and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF.  She is being sued in her individual capacity.

14.      This Court has both general and specific personal jurisdiction over Defendants because each Defendant has had substantial and continuous contact with Tennessee.  As a result, this Court has personal jurisdiction over Defendants pursuant to TENN. CODE ANN. §§ 20-2-214(1) and (2) and (6) and 20-2-223(1), (3) and/or (4) on the grounds that the claims asserted against them arise from Plaintiffs transaction of business within Tennessee and on the grounds that they have committed a tortious act within Tennessee.  Furthermore, Defendants' contacts and actions were directed toward Tennessee and thus warrant the exercise of personal jurisdiction over it pursuant to TENN. CODE ANN. § 20-2-225(2).

**IV.**

**FACTUAL ALLEGATIONS**

15.      Plaintiff Adrian Delk is a 31-year-old who suffers from decreased vision, hearing impairment, numbness, memory loss, constant pain from nerve damage, and post-traumatic stress disorder ("PTSD"), which are the result of wounds sustained from multiple assaults while in the custody of CoreCivic at HCCF.

---

[3] This Court dismissed Plaintiff's claims against Defendants Gates and Allen without prejudice on October 11, 2019. Plaintiff does not, at this juncture, attempt to re-plead these claims but reserves the right to do so should Plaintiff discover additional evidence to support his claims within the one-year savings statute.

16.    On information and belief, Defendant Perry failed to promulgate institutional policies and procedures that conformed to TDOC's policies. TDOC's promulgation of TDOC Policy 506.14 placed CoreCivic and Perry on notice that to release inmates housed in both tiers at the same time posed a significant risk of harm to inmates.

17.    TDOC policy 506.14 accurately sets out the standard of care in management of inmates in general population, and that standard of care requires the adherence to the Tier Management Supervision model at all times when medium or high security threat inmates are present.

18.    CoreCivic, Perry, Woods, and the other Defendants breached the standard of care when they failed to implement policies and/or failed to comply with the Tier Management Supervision model when they released all members of both tiers from their cells/pods on March 4, 2016.

19.    Plaintiff was repeatedly threatened and extorted by prison gang members at HCCF, specifically members of the "Crips" gang  Plaintiff reported the ongoing violence, threats, and extortion to CoreCivic corrections officers and supervisors, including but not limited to, the individual Defendants, and repeatedly requested transfer to safer locations.  As a direct and proximate result of CoreCivic's deliberate practice of understaffing its facilities, however, HCCF and Perry did not provide sufficient staff to protect Plaintiff from violent gang members, even after it learned Plaintiff had been targeted.  Furthermore, CoreCivic personnel refused to transfer Plaintiff to a safer location even upon learning of specific and direct threat's to Plaintiff's safety.

20.    Throughout January and February of 2016, Plaintiff repeatedly informed Case Worker Molone that he was in physical danger as a result of being housed with Tremale Wilson.

Wilson was a member of the Crips, a violent prison gang. Wilson repeatedly threatened and bullied Plaintiff. Wilson routinely brought other members of his gang into the cell he shared with Plaintiff, and these individuals repeatedly threatened Plaintiff. Despite Plaintiff's numerous requests and notifications of the specific threats to his safety made to Case Worker Molone, Plaintiff was left in the cell with Wilson.

21.     On, or around, February 28, 2016, Plaintiff spoke to Plaintiff Molone, who was the Case Manager of H-Unit, regarding being threatened and his fear of being assaulted and requested transfer.

22.     On, or around, February 29, 2016, Plaintiff delivered to Case Worker Molone a cell-change request form in which Plaintiff requested a change to a safer cell, specifically informing Molone that Tremale Wilson had threatened him, that Wilson's security points were too high to be housed with Plaintiff, that he feared for his safety, and that Wilson had threatened him not merely personally but with gang violence.  Plaintiff's requests were deliberately ignored, and no action was taken to ensure the safety of Plaintiff.

23.     On, or around, March 4, 2016, Plaintiff again delivered to Case Worker Molone another cell-change request form in which Plaintiff advised Molone that he was in fear for his safety because he was housed with a member of the Crips gang who had threatened him. He specifically requested a cell change to a safer cell.

24.     On, or about, March 4, 2016, at, or around 6:00 p.m., Defendants Perry and Woods violated TDOC policy 506.14, by allowing all inmates of both tiers of the pod to be out of their cells at the same time.  TDOC Policy 506.14(VI)(E) &(F) reads as follows:

> E. General population units/pods with a capacity to house 64 or more inmates who are medium or high security shall supervise in accordance with Policy #5046.01, and shall adhere to the Tier Management Supervision model at all times.  Inmates shall be allowed out of their cells for dayroom activities by tier/walk as determined by the

institutional policy; **however, inmates housed on the upper and lower tier/walk shall not be allowed out of their cells for pod/dayroom activities at the same time.** (emphasis added)

F. Each Warden shall promulgate the necessary institutional policy and procedures governing housing arrangements for inmates in accordance with this policy and incorporating the Tier Management Supervision for his/her facility.

25.     On, or about, March 4, 2016, between 7:30 p.m. – 10:00 p.m., Defendant Louden observed Crip Gang Members trying to intimidate and fight Plaintiff.

26.     On, or about, March 4, 2016, at, or around 10:00 p.m., Plaintiff was pushed into cell 214 and nearly beaten to death by seven (7) members of the Crips Gang at the Hardeman County Correctional Facility for a time period between 20 minutes and one hour.  This entire incident was recorded on videotape by security cameras in the Pod area. Plaintiff was in possession of a copy of the videotape on thumb drive to use in his complaint when it was subsequently seized and removed from Plaintiff's possession by CoreCivic employees.

27.     On, or about, March 4, 2016, at, or around 11:00 p.m., Plaintiff was discovered by Inmate Marlon Randolph (hereinafter "Inmate Randolph" or "Randolph").  Randolph pushed the intercom button to speak with Defendant Woods to inform her Plaintiff had significant head injuries, including fractures, bleeding, and he was fading in and out of consciousness.  According to the sworn affidavit of Randolph, Defendant Woods responded, "Oh well."

28.     On, or about, March 4, 2016, at, or around 11:05 p.m., Randolph again pushed the button to speak with Defendant Woods to inform her Plaintiff was still bleeding and he might die.  Defendant Woods responded, "If you press the button again you will receive a disciplinary report." Defendant Woods took no further action.

29.     On, or about, March 4, 2016, at, or around 11:30 p.m. Defendant Louden found Plaintiff in cell 214 with massive injuries, a significant head injury, fractures, lacerations, bruises, and covered in blood.  Instead of calling for medical assistance or providing medical aid,

she told Plaintiff to go back to his cell.  Plaintiff informed Defendant Louden that one of his assailants was his cell mate.  Defendant Louden stated, "I don't care. Get in the cell with him so I can do count."

30.     Defendant Louden then forced Plaintiff into a cell with his assailant, deliberately placing his life in further harm.  These actions put Plaintiff in fear for his life and lasted approximately another 20 minutes. Plaintiff suffered severe psychological trauma as a result of being confined with his attacker as guards, including one or more of the individual Defendants, looked on and took no steps to ensure his safety or to provide medical care. Plaintiff reasonably believed that he might be killed.

31.     Despite being the victim of a vicious attack and having major physical injuries so severe that they could not be treated either on site or even in Hardeman or Fayette Counties, one or more Defendants forced Plaintiff to walk to the HCCF medical facility in restraints, which exacerbated Plaintiff's injuries to the point that Plaintiff succumbed to his injuries and passed out while waiting for a helicopter to evacuate him to Regional One in Memphis.

32.     On March 5, 2016, Plaintiff was subsequently air lifted to Regional One Medical Center in Memphis, Tennessee, for a traumatic brain injury, bilateral mandible fractures (R angle and L body), left orbital floor fracture, among other injuries.  At that time, he was diagnosed with permanent hearing loss and Tinnitus.

33.     On March 9, 2016, Plaintiff was taken to the operating room with an Ear, Nose, and Throat specialist for open reduction and internal fixation/intermaxillomandibular fixation of bilateral mandible fractures and left orbital floor fracture. His jaw was wired shut, he was placed on a liquid diet, and was directed to have wire-cutters within immediate distance in case of emergency. Physicians prescribed Plaintiff 10 days' worth of clindamycin, Peridex mouthwash, a

Medrol Dosepak, as well as pain medication. Additionally, a follow up was requested for March 21, 2016, with ENT specialists and Ophthalmology as scheduled. Plaintiff was discharged in a wheelchair.

34.    Plaintiff was not authorized wire-cutters by Defendants and Defendants failed to have wire-cutters reasonably available for use on Plaintiff in the event of an emergency. On multiple occasions Plaintiff had to swallow his own vomit, nearly choking and dying.

35.    One such occasion was March 10, 2016, when Plaintiff was transported back to HCCF by Sergeant Pirtel and Sergeant Clark, both HCCF employees. Plaintiff was purposefully not restrained in the transport vehicle and hit his head, breaking his stitches and causing blood to pour down Plaintiff's throat. This in turn caused Plaintiff to vomit in his own mouth and forced him to choke on a mixture of his own blood and vomit until he could manage to swallow the rancid mixture.

36.    On March 10, 2016, a few hours after arriving back at HCCF, Plaintiff was transported to another CoreCivic facility, South Central Correctional Center (hereinafter "SCCC"). Again, Plaintiff began to vomit in his own mouth where he was forced to choke on a mixture of his own blood and vomit until he could, again, manage to swallow the rancid mixture. Plaintiff was placed in the infirmary at SCCC and remained there over three months until he was released to HCCF, or around, July 28, 2016.

37.    On, or about, June 28, 2016, Defendant was released from the infirmary at SCCC and was transported back to HCCF.

38.    On, or about, June 28, 2016, Plaintiff's first day back at HCCF, Defendants placed a known Crip Gang Member, Darius Lomax, in the cell with Plaintiff. On that same day Crip Gang Member Lomax submitted a cell-change request form in which he stated the following:

"Can't cell with Delk do to Crips jumping him. I do not feel safe sleeping round him."

39.      Between June 12, 2016, and October 21, 2016, Plaintiff filed over 20 sick call request forms for basic medical care and/or complications that arose from the brutal assault he suffered on March 4, 2016.   Plaintiff documented his own hearing and vision loss as his Traumatic Brain Injury was left untreated.   On his August 26, 2016, sick call form, Plaintiff even annotated that he has turned in ten (10) sick call forms without any response from HCCF. Plaintiff begged for medical assistance that never came because CoreCivic and HCCF wanted to keep costs low.   These institutional failures form a pattern of deliberate indifference demonstrating CoreCivic's commitment to earning profits at the expense of its constitutional and contractual obligations.

40.      On, or about, June 8, 2016, Plaintiff filed a five (5) page in-depth grievance with the Tennessee Department of Correction.   The grievance was subsequently summarized by the chairman as follows on June 29, 2016: "Claims that due to failure to operate the tier management he was assaulted and almost murdered."   The Chairman, HCCF employee, S Jones asserted that the grievance inappropriate solely on the basis it addressed multiple issues and used that as a basis to deny the substantive aspects of the grievance. To the extent that CoreCivic policies permit or require their employees to ignore complaints of major deviations from Eighth Amendment standards because of form rather than substance, CoreCivic's policies directly promote deliberate indifference to such claims and are the direct and proximate cause of Plaintiff's injuries. Defendant Perry, subsequently agreed with the Chairman's decision on July 7, 2016. His awareness of the grievance and endorsement of the outcome on solely procedural grounds constitutes acquiescence and ratification of Jones' decision and renders him liable for Jones' actions.

41.     On October 21, 2016, Plaintiff filed a *Pro Se* Complaint for Violations of Civil Rights under 42 U.S.C. §1983.

42.     After this lawsuit was filed, Plaintiff was repeatedly assaulted, threatened, and extorted by prison gang members at HCCF.  Plaintiff continued to report the ongoing violence and extortion to CoreCivic supervisors, and repeatedly requested transfer to safer locations.  As a result of CoreCivic's deliberate practice of understaffing its facilities, however, HCCF still could not provide sufficient guard staff to protect Plaintiff from violent gang members, even after it had actual knowledge of the violent attacks against Plaintiff.  Furthermore, CoreCivic personnel still refused to transfer Plaintiff to a safer location.

43.     On, or about, January 3, 2017, after dozens of ignored sick call slips, Plaintiff filed a four (4) page Inmate Grievance which detailed his injuries and their causes as well as his need to see a physician.

44.     On Exhibit pages one (1) and two (2) of the aforementioned grievance, Plaintiff drew a fully functioning eye and provided a one-and-a-half-page summary of what underlying injury he believed was causing his eyesight loss. On page three (3) of the grievance, Plaintiff drew a fully functioning jawbone and described for another page, what serious medical condition he believed was causing his un-resolved pain. A copy of the Exhibits is attached hereto as **Exhibit A**.

45.     On June 8, 2017, four (4) inmates in F-Unit cell 214 assaulted Plaintiff.  On information and belief, these inmates were also members of the "Crips" gang.  Subsequently, Plaintiff informed Dorthy Robertson, the F-Unit Manager, that he did not feel safe in F-Unit and wanted to be transferred to another unit.

46.     On June 9, 2017, Plaintiff mailed a letter to Kelsey Gates, an Internal Affairs

employee of HCCF, begging to be moved to safer housing and away from gang members that were targeting him. This letter stated with specificity the danger that Plaintiff faced by being housed with members of the prison gang that had assaulted him and being housed in close proximity to fifteen (15) members of that same gang. Plaintiff specifically requested placement in a housing unit away from these specific gang members. Plaintiff's requests went completely unanswered. This was one of three letters sent to Defendant Gates.

47.     On, or about, November 3, 2017, CoreCivic employees at HCCF placed Tradarious Perry, a known Blood gang member and former Crip gang member, who was also a known friend of Tramel Wilson, one of the original Crip Gang Members that assaulted Plaintiff in March 2016, in the cell with Plaintiff. Inmate Perry immediately began threatening to kill Plaintiff.

48.     Subsequently on, or about, November 3, 2017, Plaintiff and inmate Vincent Kelly spoke to Defendant Inell Allen to inform her Plaintiff's life was in danger due to the threats of inmate Perry. This meeting occurred in Defendant Allen's office. Plaintiff provided Defendant Allen with a cell change request form. Instead of simply remedying the problem and protecting Plaintiff from yet another assault, Allen, continuing the long pattern of institutional failures threatened both Plaintiff and inmate Kelly with punitive measures. Allen's conduct continued the pattern of deliberate indifference to Plaintiff's safety.

49.     On, or about, November 4, 2017, Plaintiff woke to inmate Perry stabbing him with a large knife. Plaintiff was stabbed no less than five (5) times. His suffered lacerations to his head, throat, and body. Plaintiff was rushed to Jackson General Hospital. Plaintiff suffers PTSD and permanent back problems due to this assault that but for the deliberate indifference of HCCF Plaintiff would not have suffered.

50.     On, or about, November 14, 2017, Defendant Robertson conducted and completed an investigation of the November 4, 2017, assault with a deadly weapon on Plaintiff.  Defendant Robertson found that Teddarius Perry "stuck" inmate Delk with an undefined object.  Upon information, and belief, Inmate Perry was subsequently charged with assault with a weapon.

51.     Defendant McKinnie, the Protective Custody Case Manager, was aware of all of the prior attacks against Plaintiff and that said attacks were the result of gang vendettas against him.  Plaintiff specifically informed McKinnie that he would be attacked if housed with another member of either the "Crips" or "Bloods" gangs.

52.     Despite these warnings, on, or about, January 17, 2018, Defendant McKinnie moved Plaintiff into Protective Custody with inmate Cleophus Craft, who was a known member of the same gang as inmate Perry.  Defendant McKinnie's actions in housing Plaintiff with Inmate Craft were deliberate, and Defendant McKinnie knew or should have reasonably anticipated that Plaintiff would be attacked if housed with Craft.

53.     On, or about, January 3, 2018, while C.O. B. Carlson was conducting rounds in segregation, Plaintiff approached C.O. Carlson to ensure he was not being released into the compound.  He advised C.O. Carlson that he did not feel safe to leave segregation due to previous assault and that he feared for his life.  C.O. Carlson prepared a report of the incident and filed a report on January 5, 2018.  On information and belief C.O. Carlson's report was passed to Case Worker McKinney who had actual knowledge of the threat posed to Plaintiff by Inmate Craft.  Defendant McKinney also had the authority to either take direct action to remedy the danger to Plaintiff's safety and/or the duty and the ability to report the risk to Plaintiff's safety to a supervisor who had the authority to directly intervene to protect Plaintiff. Despite knowledge of this report, McKinney took no action.

54.    On, or about, January 18, 2018, after receiving a report of a creditable threat against Plaintiff's life, while in Protective Custody, the place Plaintiff should have been the safest in HCCF, Craft predictably attacked Plaintiff causing him serious bodily injury.  Plaintiff was attacked for the fourth time in less than ten (10) months despite being in the safest place in the Facility.

55.    Plaintiff's injuries are part of a pattern of institutional failures.  According to a 2011 lawsuit filed by the American Civil Liberties Union, for example, understaffing by CoreCivic at their Idaho Facility led to such a violent atmosphere that CoreCivic settled the lawsuit and agreed to provide minimum staff levels.  CoreCivic was subsequently held in contempt of court in 2013 for violating the agreement and falsifying records to misrepresent the number of guards on duty.  In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees."  The Governor of Idaho, Butch Otter, ordered state officials to take control of the prison, and the company had to pay the state $1 million for understaffing.

56.    On, or about, February 23, 2017, a federal jury found that CoreCivic had violated inmates' Eighth Amendment rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correction Center.

57.    At the Oklahoma prison operated by CoreCivic, ten prisoners were involved in a fight on February 25, 2015, that left five with stab wounds.  The following month, eight more were involved in another stabbing incident.  In June of that year, thirty-three gang members fought with weapons and eleven prisons were sent to a hospital.  On September 12, 2015, four inmates were killed during a riot at the same facility.  Inmates alleged that gangs were effectively allowed to run the prisons.  According to an investigation by the Oklahoma Department of

Corrections, video evidence of the September 12, 2015, incident from three cameras at the facility were recorded over or deleted by CoreCivic employees.  Two guards were later indicted for brining drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot.  Between 2012 and 2016, one-third of all homicide in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's prison population.

58.     In August of 2016, the Office of the Inspector General (hereinafter "OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the Federal Bureau of Prisons by private contractors, including those operated by CoreCivic.  As a result, the Department of Justice indicated that it would phase out its relationships with private prisons.  That, in turn, led to the shareholder lawsuit described above.  In a separate report released on April 25, 2017, OIG found understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshall Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015.  Earlier the company tried to hide the fact that it was packing three inmates into two-inmate cells at Leavenworth, contrary to prison regulations.  The following excerpt appears in the April 25, 2017 OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees.  LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 America Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

Plaintiff restates the foregoing allegations as his own.

59.     In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately 20 inmates and prison staff.  OIG investigated and alleged the following in a report released in December of 2016:

The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members.  A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence system.  The report specifically cited the lack of Spanish-speaking staff and staff inexperience.

For years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correction and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower levels than at the time of the riot in terms of actual post coverage.  Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

Plaintiff restates the foregoing allegations as his own.

60.    On December 12, 2017, a former guard at Trousdale Turner testified before a legislative committee that she resigned from the company in September after witnesses two inmates die from medical neglect during the seven months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three days to help a dying inmate, but to no avail, and her subsequent complaints were ignored by company officials.

61.    The foregoing incidents are some, but not even remotely all, of the incidents that demonstrate that CoreCivic, its wardens, and its employees adopt and enforce a corporate policy or well-established custom of understaffing and denying medical care to inmates, all for the purpose of increasing profits, and notwithstanding that such practices led to assaults, deaths, murders, and mayhem.  The multiple assault of Plaintiff were predictable consequences of this corporate policy promoted by CoreCivic

62.    Defendant CoreCivic, Defendant Perry, and all other Defendant employees of CoreCivic, knew that understaffing, medical neglect, and inadequate training were rampant at the Facility, and did not make reasonable efforts to counteract the threats to inmate safety or provide

adequate, necessary medical care.

63.    One or more Defendants were also aware that prison gangs essentially controlled HCCF or significant portions thereof. Despite being on notice of same, these Defendants failed to take reasonable efforts to reduce the control of the gangs over the prison, such as increasing staffing levels, briefing and training guards on controlling gang activities, segregating gang members from each other, preventing communication between and among gang members, or taking other necessary and reasonable steps to minimize the control of prison gangs on HCCF.

**VI.**
**CAUSES OF ACTION**

**COUNT 1 – VIOLATION OF 42 U.S.C. § 1983 (AGAINST DEFENDANT CORECIVIC)**

64.    Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

65.    As alleged above CoreCivic, acting under color of state law and with deliberate indifference, violated the rights of Plaintiff secured by the Eighth and Fourteenth Amendments of the U.S. Constitution.

66.    At all times relevant to this Complaint, Defendant CoreCivic acted under color of law, performed government functions, was entwined in a symbiotic relationship with the Tennessee Department of Corrections and was otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288 (2000). CoreCivic is a "person" within the meaning of 42 U.S.C. § 1983.

67.    Defendant CoreCivic acted with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by establishing policies or well-established customs that directly and proximately caused the deprivation of Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution including, but not limited to, the deliberate and systematic understaffing of

19

HCCF, the deliberate and/or reckless failure to promulgate or implement the Tier Management Supervision model as directed by the Tennessee Department of Corrections, the deliberate and systematic failure to provide medical care to Plaintiff and other inmates, and the deliberate and systematic failure to implement policies and procedures designed to curtail known problems with gang control over HCCF and CoreCivic's other facilities.

68. In the alternative, CoreCivic acted with deliberate indifference, failed to properly train and/or supervise their subordinates with respect to their responsibilities in ensuring that they provide a safe environment and reasonable medical care, which proximately caused the above described constitutional rights violations.

## COUNT 2 – VIOLATION OF 42 U.S.C. § 1983 (AGAINST DEFENDANT PERRY IN HIS INDIVIDUAL AND OFFICAL CAPACITIES)

69. Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

70. As alleged above Defendants acting under color of state law, violated the rights of Plaintiff secured by the Eighth and Fourteenth Amendments of the U.S. Constitution.

71. Defendant Perry was, at all times material to this cause, the warden of HCCF. Defendant Perry either established policies or well-established customs or knowingly acquiesced in the establishment of policies or well-established customs that were the direct and proximate cause of Plaintiff's deprivation of his constitutional rights. As a result, Defendant Perry is personally liable under Section 1983. *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995)("At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate") quoting, *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1983).

## COUNT 3 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT MCKINNIE

72. Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

73.     At all times relevant to this Complaint, Defendant McKinnie acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

74.     Defendant McKinnie acted with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to reasonable measures to ensure his safety, consistent with the requirements of the Eighth Amendment.

75.     Defendant McKinnie was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

76.     Defendant McKinnie's actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

## COUNT 4 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT LOUDEN

77.     Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

78.     At all times relevant to this Complaint, Defendant Louden acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

79.     Defendant Louden acted with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to necessary medical care, consistent with the requirements of the Eighth Amendment.

80.     Defendant Louden was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

81.     Defendant Louden's actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

**COUNT 5 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT WOODS**

82.     Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

83.     At all times relevant to this Complaint, Defendant Woods acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

84.     Defendant Woods acted with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to taking reasonable measures to ensure Plaintiff's safety and his serious need for medical treatment, consistent with the requirements of the Eighth Amendment.

85.     Defendant Woods was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

86.     Defendant Woods actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

**COUNT 6 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT MOLONE**

87.     Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

88.     At all times relevant to this Complaint, Defendant Molone acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

89.     Defendant Molone acted with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to, taking

reasonable measures to ensure Plaintiff's safety, consistent with the requirements of the Eighth Amendment.

90.     Defendant Molone was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

91.     Defendant Molone actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

### COUNT 7 – NEGLIGENCE *PER SE* AGAINST DEFENDANT PERRY AND CORECIVIC

92.     Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

93.     Under Tennessee law, there are five distinct elements that must be established in any negligence claim.  The elements of negligence include (1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.

94.     It is clearly established under Tennessee law that prison officials owe a duty of care to the inmates in their custody.  *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (citing Restatement (Second) of Torts § 314A).

95.     Tenn. Code Ann. § 41-1-104(b) establishes a statutory obligation for the maintenance of policies and procedures and places that obligation upon the warden, in this case, Defendant Perry. "The custody, welfare, conduct, and safekeeping of the inmates shall be the responsibility of the warden, who will examine into the affairs of the institution daily to assure that proper standards are maintained." Tenn. Code Ann. §41-1-104(b).

96.     TDOC Policy 506.14(VI)(E) &(F) reads as follows:

E. General population units/pods with a capacity to house 64 or more inmates who are medium or high security shall supervise in accordance with Policy #5046.01, and shall adhere to the Tier Management Supervision model at all times.  Inmates shall be allowed out of their cells for dayroom activities by tier/walk as determined by the institutional policy; **however, inmates housed on the upper and lower tier/walk shall not be allowed out of their cells for pod/dayroom activities at the same time.** (emphasis added)

F. Each Waden shall promulgate the necessary institutional policy and procedures governing housing arrangements for inmates in accordance with this policy and incorporating the Tier Management Supervision for his/her facility.

97.     TDOC Policy therefore mandates the implementation of the Tier Management Supervision model.

98.     At all times material to this cause, Defendant Perry was acting within the scope of his employment as an employee and agent of CoreCivic. Therefore, CoreCivic is responsible for Defendant Perry's negligent conduct as the warden of HCCF.

99.     As described above, Defendant Perry and CoreCivic maintained policies of understaffing, failing to implement the Tier Management Supervision Model, failing to implement policies to properly segregate inmates to reasonably ensure inmate safety, and failing to implement policies to ensure that the serious medical needs of inmates were met.

100.    CoreCivic, both individually and through Perry's statutory and regulatory obligations, owed its inmates a duty of care to establish policies and procedures reasonably calculated to ensure their reasonable safety and access to healthcare for serious medical needs.

101.    CoreCivic actively established policies or well-established customs of understaffing and failing to provide for the serious medical needs of prisoners nationally and at HCCF and failed to adequately implement the Tier Management Supervision model as required by TDOC policy.

102.    Plaintiff's injuries have already been identified in the incorporated paragraphs,

24

and CoreCivic and Perry's breach of the statutory and regulatory obligations described in this count are the direct and proximate cause of those injuries.

### COUNT 8 – NEGLIGENCE AGAINST CORECIVIC ARISING FROM VICARIOUS LIABILITY FOR THE ACTS OF DEFENDANTS MCKINNIE, LOUDEN, WOODS, AND MOLONE

103.    Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

104.    Under Tennessee law, there are five distinct elements that must be established in any negligence claim.  The elements of negligence include (1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.

105.    It is clearly established under Tennessee law that prison officials owe a duty of care to the inmates in their custody.  *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (citing Restatement (Second) of Torts § 314A); Tenn. Code Ann. § 41-1-104(b) ("The custody, welfare, conduct, and safekeeping of the inmates shall bet the responsibility of the warden, who will examine into the affairs of the institution daily to assure that proper standards are maintained.").

106.    Prison officials are not, however, "insurers" of each prisoner's safety."  *King v. Anderson Cnty.*, 419 S.W.3d 232, 248 (Tenn. 2013); *Jackson v. United States*, 24 F. Supp. 2d 823, 833 (W.D. Tenn. 1998) (citing *Cockrum v. State of Tenn.*, 843 S.W.3D 433, 437 (Tenn Ct. App. 1992)).  "Vigilance" on the part of prison officials is required, not "prescience," and "[t]he critical factor in distinguishing between vigilance and prescience is foreseeability, the third element in the proximate cause analysis."  *King*, 419 S.W.3d at 248.  This means "to establish proximate causation necessary to prevail in a negligence action against a penal institution for an

inmate-on-inmate assault, the intuition must have had prior notice of an attack." *Id.* Notice of this kind can either be actual or constructive. *Id.*

107.    CoreCivic received actual notice from Plaintiff that a threat was imminent not once, but twice before major assaults. Furthermore, Defendants had constructive notice that subsequent attacks would occur by the same gang after the first assault on March 4, 2016. At all times, Plaintiff informed CoreCivic's agents and employees of his fear of repeat assaults, even going so far as to accept disciplinary action to prevent himself from being placed in general population. Therefore, CoreCivic breached its duty of care regarding safekeeping.

108.    CoreCivic, through its agents and employees, received actual notice from Plaintiff that he was in need of serious medical treatment, on no less than twenty (20) occasions, to include but not limited to, loss of hearing, loss of vision, infections, and problems with memory due to his diagnosed traumatic brain injury. Furthermore, CoreCivic, through its agents and employees, was on constructive notice that Plaintiff needed advanced, continuing medical treatment because he had recently been subject to a brutal assault, which left him with a traumatic brain injury and multiple fractures. Therefore, CoreCivic breached its duty of care regarding welfare.[4]

109.    Defendant CoreCivic is responsible for the acts and omissions of its employees and agents while acting within the scope of their employment. CoreCivic is therefore responsible for the negligent acts of all individual Defendants.

110.    Plaintiff's injuries have already been identified in the incorporated paragraphs, all of which arose as a direct and proximate cause of the negligence of CoreCivic through its

---

[4] Plaintiff does not assert a claim for healthcare liability against CoreCivic. Rather Plaintiff alleges that his injuries were the direct and proximate result of HCCF staff failing to even give him access to medical professionals. CoreCivic, when acting in its role as a private prison operator, is not itself a "Healthcare Provider" subject to the protections of the Healthcare Liability Act.

policies, agents, and employees.

## COUNT 9 – GROSS NEGLIGENCE AGAINST ALL DEFENDANTS

111.    Plaintiffs incorporate paragraphs 1 through 63 as if fully set forth in this Count.

112.    Three conditions plaintiffs can use to establish the present of gross negligence are as follows: (1) such entire want of care as would raise a presumption of conscious indifference to consequences, or (2) a heedless and reckless disregard for another's rights, or (3) utter unconcern for the safety of others.  *Gross v. Nashville Gas. Co.*, 608 S.W.2d 860 (Tenn. Ct. App. 1980).

113.    If the court finds there both deliberate indifference and negligence under Tennessee law, there must also be gross negligence.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against Defendants on each Count of the Complaint and pray for the following relief:

1.      Issue service of process and serve the Defendants;

2.      Permit Plaintiff leave to amend this Complaint after reasonable discovery;

3.      Empanel a jury to try this matter;

4.      Award Plaintiff compensatory damages in an amount of not less than $1,000,000;

5.      Award Plaintiff punitive damages against all Defendants;

6.      Award Plaintiff his reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

7.      Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

8.      Award pre-and post-judgment interest pursuant to TENN. CODE ANN. § 47-14-123 in amount according to the proof at trial; and

9.      Grant the Plaintiff such further relief as the Court may deem just and proper.

Respectfully submitted,


/s/ *Brice M. Timmons*
William E. Cochran, Jr. (#21428)
Brice M. Timmons (#29582)
Charles S. Mitchell (#23789)
BLACK MCLAREN JONES RYLAND & GRIFFEE PC
530 Oak Court Drive, Suite 360
Memphis, TN  38117
(901) 762-0535 (Office)
(901) 762-0539 ( Fax)
wcochran@blackmclaw.com
btimmons@blackmclaw.com
cmitchell@blackmclaw.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon all parties of record via the Court's ECF system on the 4th day of June, 2020.


/s/ *Brice M. Timmons*

28